**Stan T. FENSKE, Appellant,**

v.

**STATE of Iowa, Appellee.**

No. 97–608.

Supreme Court of Iowa.

March 24, 1999.

Philip B. Mears of the Mears Law Office, Iowa City, for appellant.

Thomas J. Miller, Attorney General, Thomas Tauber, Assistant Attorney General, and Michael W. Mahaffey, County Attorney, for appellee.

LARSON, Justice.

This is an appeal from a district court order denying Stan T. Fenske's application for postconviction relief under Iowa Code chapter 822 (1997). We affirm.

## I. Statement of the Case.

Fenske was convicted in 1991 of first-degree burglary, assault with intent to inflict serious injury, and simple assault. He appealed, and the court of appeals reversed the conviction on the burglary count. On further review, we vacated the court of appeals decision and reinstated the conviction. *State v. Fenske*, 500 N.W.2d 447 (Iowa 1992) (table; case not reported) (*Fenske I*).

Fenske petitioned for federal habeas corpus relief on the grounds (1) no rational juror could have found the elements of burglary beyond a reasonable doubt, and (2) his counsel was ineffective because he did not request a limiting instruction regarding the State's impeachment evidence. The federal district court denied relief, and the eighth circuit court of appeals affirmed. *See Fenske v. Thalacker*, 60 F.3d 478 (8th Cir.1995).

Fenske then applied for postconviction relief under Iowa Code chapter 822. He claimed that, when we affirmed his conviction in *Fenske I*, we did so "on a theory of guilt that was neither charged in the trial information nor presented to the jury." The court denied his application.

## II. The Facts.

The evidence at the burglary trial showed that early in the morning of June 20, 1990, Fenske and William Weant went to Maurine Creamer's house. Creamer was out of town, and Danelle Besco was living there with Creamer's consent. Fenske knocked at the door with no response. He and Weant walked in. Besco was asleep upstairs, and a friend of Creamer, Michael Bown, was asleep on the couch on the main floor. Bown awakened and found Fenske standing in the room. Fenske asked Bown where Besco was, and Bown, who had not seen Besco return after leaving earlier, said that Besco was not there. Fenske went upstairs and found Besco, who told Fenske to leave. Fenske went

downstairs and pulled out his gun, threatened to shoot Bown for lying to him, and struck Bown several times with the gun. Besco ran out the back door and called the police.

## III. The Issue.

■ Fenske maintains his conviction was erroneously affirmed by this court in *Fenske I* because we decided the case on a theory not presented to the jury. He did not raise this objection prior to the present postconviction relief proceeding but contends he is excused from doing so because he received ineffective assistance of counsel. We do not address the ineffective-assistance-of-counsel issue because we reject Fenske's argument on its merits.

The burglary statute under which Fenske was convicted provided:

Any person, having the intent to commit a felony, assault or theft therein, who, *having no right, license or privilege to do so*, enters an occupied structure, such occupied structure not being open to the public, or who remains therein after it is closed to the public or after the person's right, license or privilege to be there has expired, or any person having such intent who breaks an occupied structure, commits burglary.

Iowa Code § 713.1 (1991) (emphasis added).

The key issue throughout this case has been whether Fenske had a "right, license or privilege" to enter the house. He claims the State tried the case on the theory that Besco had standing to give or deny consent to Fenske's entry. In the appeal in *Fenske I*, we suggested that the evidence would also support a finding that *Creamer* had the right to consent, and Fenske's entry was beyond the scope of that consent. This constituted a fatal discrepancy, according to Fenske, because the case was tried on the theory that Besco, not Creamer, had the authority to give consent.

Fenske relies primarily on two United States Supreme Court cases to support his argument: *Chiarella v. United States*, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980), and *Dunn v. United States*, 442 U.S.

100, 99 S.Ct. 2190, 60 L.Ed.2d 743 (1979). In *Chiarella* the defendant was an employee of a financial publication and through that position acquired advance information about a proposed corporate takeover. Chiarella acted on that information by trading in stock in the target company. He was convicted of fraud against the *sellers,* but on appeal the government relied on an alternative theory, that Chiarella's acts also constituted fraud against the *buyers.* The Supreme Court refused to consider this alternative theory because it had not been presented to the jury. *Chiarella,* 445 U.S. at 235–37, 100 S.Ct. at 1118–19, 63 L.Ed.2d at 361–62.

In *Dunn* the defendant was charged with giving false testimony in a sworn statement made by him in an attorney's office. The government charged this was a false statement made in a "proceeding ... ancillary to [a] court proceeding," a violation of federal law. Dunn later incorporated this statement in his grand jury testimony. The Supreme Court held that the earlier statement, made in the lawyer's office, was not "ancillary" to a court proceeding, so the conviction could not stand. Moreover, the court ruled his conviction could not be affirmed on the basis his grand jury testimony incorporating the lawyer's office statement was a "court proceeding" under the statute; because the indictment had not charged the act of lying before the grand jury, the Court held the case suffered from a fatal "discrepancy between the basis on which the jury rendered its verdict and that on which the Court of Appeals sustained petitioner's conviction." *Dunn,* 442 U.S. at 106, 99 S.Ct. at 2194, 60 L.Ed.2d at 750. The Court stated:

> To uphold a conviction on a charge that was neither alleged in an indictment nor presented to a jury at trial offends the most basic notions of due process. Few constitutional principles are more firmly established than a defendant's right to be heard on the specific charges of which he is accused.

*Id.* at 106, 99 S.Ct. at 2194, 60 L.Ed.2d at 750.

■ Both *Chiarella* and *Dunn* are inapposite. The "theory" of a charge is to be determined by examining the charging instrument, *Dunn,* 442 U.S. at 106, 99 S.Ct. at 2194, 60 L.Ed.2d at 749–50, and the court's instructions, *Chiarella,* 445 U.S. at 236, 100 S.Ct. at 1118–19, 63 L.Ed.2d at 361–62. In this case, the county attorney's information against Fenske did not charge any theory as to who had the authority to give consent. In keeping with our "short-form indictment" rule, Iowa R.Crim. P. 31, form 10, the information simply stated:

> Said Defendant, on or about the 20th day of June, 1990, in Poweshiek County, Iowa, did: at 933 Center Street in Grinnell, Iowa, enter an occupied structure, namely a residence, with no right, license or privilege to do so, having the intent to commit an assault therein, and at the time of entering the residence, did possess a dangerous weapon.

Nor was any theory stated in the court's instruction concerning who was in a position to deny consent. The instructions merely stated the elements of the charge, including:

> 1. On or about the 20th day of June, 1990, the defendant entered a residence at 933 Center Street.
>
> 2. The residence was an occupied structure as defined in Instruction No. 17.
>
> 3. *The defendant did not have permission or authority to enter the residence.*

(Emphasis added.)

Neither the county attorney's information nor the court's instructions evidenced a theory as to who had the right to give or withhold consent to entering the home. The only theory at trial was that Fenske did not have authority to enter. Both the opening statement (which was reported) and the instructions made it clear that whether Fenske had consent to enter the house was a fact question for the jury.[1] The jury resolved the

---

1. A scenario illustrating a fatal discrepancy between the State's trial theory and a theory on which an appellate court affirmed the conviction can be envisioned in the context of the present case. The county attorney's information against

Fenske charged a specific *elevating* factor to raise the crime to first-degree burglary, as the State is required to do by Iowa Rule of Criminal Procedure 31, Form 10. *See* Iowa Code § 713.3. Here, the county attorney charged that the ele-

question against Fenske, and substantial evidence supports that finding. The district court properly denied the application for postconviction relief.

AFFIRMED.

All justices concur except SNELL, LAVORATO, and TERNUS, JJ., who dissent.

SNELL, Justice (dissenting).

I respectfully dissent. On this second appeal to our court by defendant Stan T. Fenske, questions of law are at issue that were not raised or considered in the first appeal. The first appeal, on which Fenske's conviction was affirmed, considered only a question of sufficiency of the evidence. This second appeal attacks our affirmance in the first appeal on the ground that it was based on a theory of guilt that differs from the prosecutor's theory on which the case was tried or on which the jury convicted. As such, Fenske asserts he has suffered a violation of his constitutional right to trial by jury guaranteed by the United States Constitution's Sixth Amendment, and his Fifth and Fourteenth Amendment rights to due process and adequate notice of the charges against him. I believe these claims now presented by Fenske are meritorious and show that his conviction is unconstitutionally flawed. I would reverse.

## I. Factual and Procedural Background

A jury could have found the following facts from testimony presented at Fenske's trial. In the early morning hours of June 20, 1990, Fenske made a series of telephone calls to the residence of a friend, Maurine Creamer. Although Creamer normally lived in the home, which was owned by her mother, Fenske knew Creamer had left town for Las Vegas that day. It is undisputed that Creamer gave permission to her friend Danelle Besco to live in the house while she was away and told her she was "in charge." Michael Bown, a former boyfriend of Creamer's who was staying at the house that night, answered the calls. Bown testified he did not know the caller and did not understand what the caller wanted. He hung up after a short period of time on each call. Following the telephone calls, Fenske and a friend, William Weant, walked to Creamer's house. Weant testified that Fenske went to the house for a "confrontation," "to meet the challenge," or in other words, for a "fight." Fenske was carrying a gun.

Fenske and Weant knocked at the front door, then entered when no one responded. Fenske and Weant found Bown asleep on a couch on the main floor of the house. Fenske woke Bown and asked whether Besco was in the house. Because Bown had gone to sleep while Besco was still out, he told Fenske she was not there. Unbeknownst to Bown, however, Besco had returned after he fell asleep and was asleep in a bedroom on the second floor of the house. Not believing Bown, Fenske proceeded upstairs, where he found Besco sleeping.

According to Besco, she awoke to find Fenske partially reclined on the opposite side of the bed "caressing" her face. Besco noticed a gun in his lap. Fenske allegedly made several advances toward Besco, kissing her on the hand, arm, cheek and chest area and touching various parts of her body. She refused these advances and repeatedly asked him to leave. Weant arrived upstairs at some point during the encounter and eventually both Fenske and Weant went back downstairs. Fenske assumed Bown had lied about Besco's presence and confronted Bown, who was still on the couch. Fenske accused Bown of lying, pointed the gun toward Bown's head and stated, "I should shoot you for lying to me." Fenske struck Bown on the face and head several times with the handle of his gun, drawing blood and knocking him unconscious. During this confrontation, Besco left the house via the back door and from another location phoned

---

vating factor was possession of a dangerous weapon. The court so instructed the jury, and the theory of the prosecution became fixed. If we had affirmed Fenske's conviction on the basis of another elevating factor under the statute, such as possession of an explosive, that would clearly be a discrepancy under *Chiarella* and *Dunn.* That is not the sort of case we have here; the prosecution "theory" was simply that Fenske had no consent from *anyone* to be in the residence, and the jury was free to decide within the record whether that was so.

the police, who arrived at the house after Fenske and Weant left.

At trial, Fenske presented evidence tending to show he had permission to enter the home. Creamer testified she had given Fenske permission to check on the house and enter if necessary while she was away. Creamer stated she approved of Fenske's entry on the morning in question. Creamer also testified that she did not tell Besco she had given Fenske this authority. The State presented rebuttal impeachment testimony from Bown, who testified that in a telephone conversation with Creamer shortly after the incident, Creamer told him that Fenske had no right to be in the house. The jury convicted Fenske of first-degree burglary, assault with intent to inflict serious injury, and simple assault.

Fenske appealed, contending insufficient evidence existed to sustain the burglary conviction and that his counsel rendered ineffective assistance by failing to request a limiting instruction regarding Bown's impeachment testimony. In an unpublished opinion, the court of appeals reversed Fenske's burglary conviction, holding the State failed to prove Fenske had "no right, license, or privilege" to enter the residence, an element of burglary under Iowa law. *See* Iowa Code § 713.1 (1989). On further review, our court vacated the decision of the court of appeals and affirmed the burglary conviction in an unpublished per curiam decision. We found "there was evidence on which the jury could reasonably conclude that any permission given to Fenske to enter the house on other occasions (apparently to check it in the absence of the owner) was exceeded when he entered the house on the night in question." On that predicate we affirmed the conviction for first-degree burglary. We denied Fenske's petition for rehearing.

By new counsel, Fenske then filed a petition for habeas corpus relief pursuant to 28 U.S.C. § 2254 (1994), raising the same claims he had raised on direct appeal. Both the United States District Court for the Southern District of Iowa and the Eighth Circuit Court of Appeals denied relief. *See Fenske v. Thalacker,* 60 F.3d 478 (8th Cir.1995).

Again with new counsel, Fenske filed an application for postconviction relief in Iowa district court, raising the claim that our court violated his Fifth and Fourteenth Amendment rights to due process and his Sixth Amendment right to trial by jury in affirming his conviction based on a theory not presented to the jury and that his appellate counsel was ineffective in failing to raise this issue in his petition for rehearing.

The district court denied the application, concluding that Iowa Code chapter 822 does not grant the "district court the authority to pass judgment on decisions of the Iowa Supreme Court." Fenske filed a motion pursuant to Iowa Rule of Civil Procedure 179(b) requesting the district court to rule specifically on whether our court considered a theory not raised at trial. The district court entered a ruling finding the theory that Fenske had exceeded the authority given to him by Creamer was not presented to the jury. Fenske appeals.

## II. Review of Decisions Rendered in Fenske's Direct Appeal

It is helpful to examine our earlier opinion to determine precisely on what ground we based our affirmance of Fenske's conviction. Also helpful is a review of the court of appeals decision, in which a dissenting judge espoused the notion that Fenske may have exceeded any right, license, or privilege Creamer granted to enter the property.

A majority of the court of appeals concluded that insufficient evidence existed to support the jury verdict on the element of no right, license or privilege. The court grounded its decision on the basis of Creamer's testimony, in which she stated that she asked Fenske to check on the house in her absence. The court held that Besco's understanding of her authority was irrelevant because Creamer still had the authority to grant permission to others to enter the home. The court found that Bown's rebuttal testimony offered by the State in an attempt to counteract Creamer's testimony could not be used by the jury as substantive evidence. Therefore, the court concluded that "no rational jury could find all the elements of

burglary in the first degree are established here."

Judge Donielson dissented from the panel decision, concluding the State had met its burden of proof on the element that Fenske had no right, license or privilege to enter the house. Judge Donielson noted that Creamer's testimony established Fenske had permission to enter the house for the purpose of periodically checking on it. Therefore, Judge Donielson concluded as follows:

> The jury may very well have found Fenske's right, license or privilege to enter the premises was therefore limited. The limit would not have been defined in terms of time of day or length of stay, but rather, in terms of purpose. The jury did find that on the night in issue Fenske had entered the house not for the purpose of checking on it, but rather, for the purpose of committing a felony inside. As such, the jury certainly could have found Fenske, having exceeded the limits of his permission, was without right, license or privilege to enter the house.

The State sought further review with our court, which was granted. In its application for further review, the State relied in part on the theory presented in Judge Donielson's dissent. The State also contended the jury may have chosen not to believe Creamer's testimony that she had granted Fenske permission to enter based on their prior friendship, which may have raised suspicions of bias with the jury. The State also noted that Besco's testimony was not irrelevant on the issue of Fenske's theory to enter, arguing the jury could have concluded that if Creamer had in fact given Fenske permission to enter, she certainly would have told Besco, who would be living in the home. Furthermore, the State argued, Bown's rebuttal testimony may have undermined Creamer's credibility in the eyes of the jury. In his resistance to the State's application, Fenske's attorney did not directly address the State's argument that Fenske exceeded the authority granted to him by Creamer.

Our opinion noted as follows with regard to the "exceeded permission" theory:

> In the present case, there was evidence on which the jury could reasonably con-

clude that any permission given to Fenske to enter the house on other occasions (apparently to check it in the absence of the owner) was exceeded when he entered the home on the night in question.

Our discussion of the exceeded permission theory ends with that statement. We concluded that substantial evidence existed to support the jury's verdict that Fenske was guilty of first-degree burglary.

### III. Standard of Review

Generally, an appeal from denial of an application for postconviction relief is reviewed for the correction of errors of law. *Harpster v. State*, 569 N.W.2d 594, 596 (Iowa 1997). However, if the applicant asserts violations of constitutional safeguards, we review the case de novo, "in light of the totality of the circumstances and the record upon which the postconviction court's ruling was made." *Id.* (quoting *Giles v. State*, 511 N.W.2d 622, 627 (Iowa 1994)). We utilize de novo review for claims of ineffective assistance of counsel. *Irving v. State*, 533 N.W.2d 538, 540 (Iowa 1995).

### IV. Preservation of Error

Fenske correctly acknowledges in his brief that his failure to raise the due process issue in his petition for rehearing creates a preservation-of-error issue. Fenske claims that our court erred in affirming his conviction on direct appeal by basing our decision on a theory not presented to the jury. However, Fenske failed to raise this alleged error in his next opportunity for review—his petition for rehearing following our court's affirmance of his conviction. None of the grounds urged for reversal of his conviction in the petition for rehearing touched on the ground which he now raises in his postconviction application. As we have previously noted, such an omission "presents him with a formidable obstacle" to overcome. *Osborn v. State*, 573 N.W.2d 917, 921 (Iowa 1998). We have summarized the rules of error preservation in postconviction claims as follows:

> Iowa Code section 822.8 (1997) provides that postconviction relief may not be granted on assignments not asserted in

prior applications for relief in the absence of a showing of good cause. Under this provision we have long held postconviction relief is not a means for relitigating claims that were or should have been properly presented on direct appeal. *Earnest v. State,* 508 N.W.2d 630, 632 (Iowa 1993); *Washington v. Scurr,* 304 N.W.2d 231, 235 (Iowa 1981). Thus any claim not properly raised on direct appeal may not be litigated in postconviction unless there is a showing of "sufficient reason" or "cause" for not properly raising it previously, and of actual prejudice resulting from the alleged error. *Jones v. State,* 479 N.W.2d 265, 271 (Iowa 1991); *Polly v. State,* 355 N.W.2d 849, 856 (Iowa 1984).

*Id.* Our rules of error preservation require a party to raise an alleged error at the first possible opportunity. *See id.* at 923 ("If error is first spotted at the appellate level it is still important that it be raised at the earliest opportunity.").

Although we have never before addressed the issue of whether a defendant must raise a new claim of error (*i.e.* an alleged error by our court) in his or her petition for rehearing to preserve that claim for postconviction relief, I believe a defendant must do so in order to comply with the mandate of raising error at the first opportunity. Because Fenske failed to raise this alleged error at the earliest opportunity, it may not be litigated in postconviction proceedings unless there is a showing of "sufficient reason" or "cause" for not raising it previously and actual prejudice resulting from the error. *See Jones v. State,* 479 N.W.2d 265, 271 (Iowa 1991). Fenske contends the ineffectiveness of his appellate counsel satisfies the "sufficient reason" or "cause" requirement. *See Earnest v. State,* 508 N.W.2d 630, 632 (Iowa 1993). Therefore, Fenske's constitutional claim must be considered in that context.

## V.  Ineffective Assistance of Counsel

### A.  General Principles

Ineffective assistance of counsel may constitute "sufficient reason" or "cause" for not raising an issue on direct appeal. *See Kane v. State,* 436 N.W.2d 624, 627 (Iowa 1989); *Lamphere v. State,* 348 N.W.2d 212, 215

(Iowa 1984). Thus, we must determine whether Fenske's appellate counsel was inadequate in his representation by failing to raise Fenske's constitutional claim in the petition for rehearing. To establish his claim of ineffective assistance of counsel, Fenske has the burden to prove that "(1) his ... counsel failed in an essential duty, and (2) prejudice resulted from counsel's error." *State v. Arne,* 579 N.W.2d 326, 328–29 (Iowa 1998). We may deny an application for postconviction relief if either element is unproven. *State v. Brooks,* 555 N.W.2d 446, 448 (Iowa 1996). To establish that his appellate counsel failed in an essential duty, Fenske must show that "his attorney's performance fell outside the normal range of competency." *State v. Henderson,* 537 N.W.2d 763, 765 (Iowa 1995). A presumption exists that counsel performed competently. *State v. McPhillips,* 580 N.W.2d 748, 754 (Iowa 1998). In conducting this inquiry, "we examine the merits of the issue counsel allegedly failed to raise." *Id.* Trial counsel is not incompetent in failing to pursue an issue that has no merit. *Id.; State v. Ceaser,* 585 N.W.2d 192, 195 (Iowa 1998). To prove prejudice, Fenske must show there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Osborn,* 573 N.W.2d at 922 (citations omitted). A reasonable probability is "a probability sufficient to undermine confidence in the outcome" of the proceeding being challenged, in this case our previous decision on Fenske's direct appeal. *Id.* (citations omitted).

### B.  Merits of Constitutional Claim

Counsel cannot be found incompetent for failing to pursue a meritless issue. *McPhillips,* 580 N.W.2d at 754. Thus, we turn to a consideration of whether Fenske's constitutional argument has any merit. Fenske maintains that in affirming his conviction on direct appeal, our court erred by relying on a theory of guilt not presented to the jury during trial. Fenske alleges that this action violates his Sixth Amendment right to trial by jury and his Fifth and Fourteenth Amendment rights to due process and adequate notice of the charges against him.

### 1. Case Law

To support his claim, Fenske relies on two United States Supreme Court decisions in which the Court concluded that affirming a conviction on a theory of guilt neither alleged in the trial information nor presented to the jury at trial violates a defendant's due process rights. The first of these cases is *Dunn v. United States*, 442 U.S. 100, 99 S.Ct. 2190, 60 L.Ed.2d 743 (1979). In *Dunn*, the defendant testified before a federal grand jury under a grant of immunity. His testimony implicated a fellow inmate in various drug-related offenses. Following Dunn's testimony, the grand jury indicted the fellow inmate. Several months later, Dunn visited the fellow inmate's counsel and made an oral statement under oath in which he recanted portions of his grand jury testimony which implicated the other inmate. At a later evidentiary hearing in federal district court, Dunn adopted the statement given in the attorney's office and testified that only a small portion of his testimony before the grand jury was true. *Dunn*, 442 U.S. at 102–03, 99 S.Ct. at 2192–93, 60 L.Ed.2d at 748.

Dunn was subsequently indicted on five counts of making false declarations in violation of 18 U.S.C. § 1623 based on the sworn statement Dunn made in the attorney's office. The Government indicated it would rely on the "inconsistent declarations" method of proof authorized by § 1623(c). Pursuant to that subsection, the Government was required to establish "the materiality and inconsistency of declarations made in proceedings before or ancillary to a court or grand jury." *Id.* at 104, 99 S.Ct. at 2193, 60 L.Ed.2d at 749. At trial, over Dunn's objection, the Government introduced pertinent parts of Dunn's grand jury testimony, his testimony at the evidentiary hearing, and his sworn statement before the fellow inmate's attorney. Following his conviction Dunn appealed, contending the sworn statement should not have been admitted because it was not made in a proceeding ancillary to a federal court or grand jury as required pursuant to the theory of guilt the Government advanced at trial.

The Tenth Circuit Court of Appeals affirmed Dunn's conviction. Although it agreed with Dunn that the sworn statement made in front of the fellow inmate's attorney was not an ancillary proceeding under § 1623, the court noted that the evidentiary hearing at which Dunn adopted the earlier statement did qualify as such a proceeding. Although the court recognized that the indictment specified the sworn statement rather than the evidentiary hearing as the ancillary proceeding which established the charge, it concluded the discrepancy was a "nonprejudicial variance between the indictment and proof at trial." *Id.* at 104–05, 99 S.Ct. at 2193, 60 L.Ed.2d at 749–50.

The Supreme Court granted certiorari and reversed the Tenth Circuit. It noted that "[w]hereas the jury was instructed to rest its decision on Dunn's [sworn] statement, the Tenth Circuit predicated its affirmance on petitioner's [evidentiary hearing] testimony." *Id.* at 106, 99 S.Ct. at 2194, 60 L.Ed.2d at 750. Thus, the Court noted, "there was a discrepancy between the basis on which the jury rendered its verdict and that on which the Court of Appeals sustained petitioner's conviction." *Id.* The Court stated the following as the basis for its holding:

> To uphold a conviction on a charge that was neither alleged in an indictment nor presented to a jury at trial offends the most basic notions of due process. Few constitutional principles are more firmly established than a defendant's right to be heard on the specific charges of which he is accused.

*Id.*

In examining the Tenth Circuit's opinion, the Court noted that there was "no glaring distinction between the Government's theory at trial and the Tenth Circuit's analysis on appeal." *Id.* at 107, 99 S.Ct. at 2194, 60 L.Ed.2d at 750. In addition, the Court recognized that the jury might have reached the same verdict had the Government's case been based on the evidentiary statement instead of the sworn statement before the fellow inmate's attorney. However, the Court noted that "the offense was not so defined, and appellate courts are not free to revise the basis on which a defendant is convicted simply because the same result would likely obtain on retrial." *Id.*

Fenske also relies on *Chiarella v. United States*, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980), to support his claim. In *Chiarella*, an employee of a financial printing company hired to produce announcements of a corporate takeover was convicted of violating the federal law against insider trading after he purchased stock in the target companies based on information in the announcements and later sold the stock at a profit after the takeover attempt became public knowledge. *Chiarella*, 445 U.S. at 224, 100 S.Ct. at 1112–13, 63 L.Ed.2d at 354. Chiarella was convicted and the Second Circuit Court of Appeals affirmed the conviction. On certiorari review, the Supreme Court concluded Chiarella's conviction could not be sustained on the ground urged at the district court level—that Chiarella had a duty to disclose his knowledge to the sellers of stock from whom he purchased shares—because he owed no fiduciary duty to the sellers. *Id.* at 233–35, 100 S.Ct. at 1117–18, 63 L.Ed.2d at 359–61.

In its brief, the Government advanced an alternative theory to support Chiarella's conviction. It contended that Chiarella breached a duty to the acquiring corporation when he acted on the information he obtained by virtue of his employment. The Supreme Court found consideration of this theory was unwarranted because it had not been submitted to the jury. The jury was instructed it could convict if Chiarella's conduct had the effect of defrauding a *seller*. As the Supreme Court noted, "[t]he jury was not instructed on the nature or elements of a duty owned by petitioner to anyone other than the sellers." *Id.* at 236, 100 S.Ct. at 1119, 63 L.Ed.2d at 361–62. The Court therefore concluded it could not consider the theory because it could not "affirm a criminal conviction on the basis of a theory not presented to the jury." *Id.*

Fenske also cites a First Circuit case in support of his argument. *See Cola v. Reardon*, 787 F.2d 681 (1st Cir.1986). *Cola* is similar to *Dunn* in that the acts the defendant was accused of occurred on more than one occasion, one of which was not listed in the indictment or bill of particulars or relied upon by the State in presenting its case to the jury. Defendant Cola, an attorney employed by the Commonwealth of Massachusetts, was accused of acting as an agent for someone other than the commonwealth in a matter in which the commonwealth and a state agency were parties and had a direct and substantial interest. *Id.* at 683. The bill of particulars alleged that the defendant acted as an agent by granting a second mortgage to a company owned by a friend, obtaining a loan for that friend, and obtaining payment of debts of the company other than those owed to the commonwealth. The bill of particulars did not allege that the defendant's wrongful act of agency pertained to his alleged representation of the friend at a bankruptcy proceeding. *Id.* at 686.

The following excerpt highlights Cola's contention in his habeas corpus petition:

Cola's argument, then, is not necessarily that his behavior at the bankruptcy proceeding was not a crime. Neither does he dispute the fact that evidence on the matter was before the jury. Rather, Cola claims that such evidence was incidental vis a vis the prosecutor's case or theory of guilt as presented to the jury. This theory of guilt, argues Cola, was the loan transactions found by the state appellate tribunal to be no crime. Accordingly, citing the Massachusetts Appeals Court, Cola asserts that the acts or theory of guilt upon which he was tried did not constitute a crime. Further, citing *Dunn v. United States ...*, Cola asserts that the state appeals court, in upholding his conviction on a theory of guilt not presented at trial [his behavior at the bankruptcy proceeding], violated his due process right to have such guilt determined on a basis set forth in the indictment and presented to the jury.

*Id.* at 687.

After comparing Cola's case to *Dunn v. United States*, the First Circuit concluded that Cola's conviction had been improperly affirmed on a theory not presented at trial. The court noted as follows:

We are hard-pressed to distinguish the present case from *Dunn*. Frankly, we also see "no glaring distinction" between the theory of the Massachusetts Appeals Court and the proof at trial. The "dual represen-

tation" appellate theory *can* be adduced from the facts. But it was not the government's focus, or as *Dunn* requires, "the theory on which the case was tried and submitted to the jury." Reference to the dual representation theory, if ever made explicit, was only incidental. The *Dunn* Court regarded tangential references ... as insufficient because, in the Court's view, the prosecution did not "build its case" on such evidence.... Thus, we believe that, in order for any appellate theory to withstand scrutiny under *Dunn*, it must be shown to be not merely before the jury due to an incidental reference, but as part of a coherent theory of guilt that, upon reviewing the principal stages of trial, can be characterized as having been presented in a focused or otherwise cognizable sense.

*Id.* at 693 (citations and footnote omitted).

## 2. Analysis

Based on the framework set forth in *Dunn*, *Chiarella*, and *Cola*, it is essential to determine whether the exceeded permission theory was before the jury as part of a coherent theory of guilt presented in a focused manner upon review of the principal stages of trial. *Id.* In determining the theory of guilt presented to the jury, the court in *Dunn* examined the indictment and the judge's instructions to the jury. *Dunn*, 442 U.S. at 106, 99 S.Ct. at 2194, 60 L.Ed.2d at 750. The court in *Cola* also examined the prosecutor's opening and closing statements. *Cola*, 787 F.2d at 693 (principal stages of trial are those which constitute the theory on which the case was tried and submitted). The direct and cross-examination of Creamer is another factor to consider, as her testimony goes to the crux of the issue involved.

### a. Trial Information and Jury Instructions

The trial information and jury instructions are not particularly helpful in assessing the theory on which the State tried this case. Both documents merely set forth the ele-

ments of burglary and do not expand on what theory the State intended to use at trial to prove Fenske had no right, license or privilege to enter the home.

### b. State's Opening and Closing Statements

In discussing the burglary charge in its opening and closing statements, specifically with respect to the "no right, license or privilege" element, the State centered its argument around the contention that it was Besco, not Creamer, who had the authority to consent to Fenske's entry to the home. The scope of permission which Creamer granted to Fenske was not argued by the prosecutor.

### c. Creamer's Testimony

The State's cross-examination of Creamer focused on whether Besco was left "in charge" of the house and was residing there at the time of the incident. The brief exploration of the scope of Fenske's permission to enter the home was initiated by defense counsel to establish its position that Fenske had permission to be in the house that night. Although the State asked several questions to follow up on defense counsel's questions, those questions do not establish that the State relied on this theory at trial. The answers elicited were merely incidental to the prosecution's theory of guilt and not obtained for the purpose of showing Fenske exceeded the authority granted by Creamer.

### 3. Conclusion

Upon a de novo review of the record, I conclude that the State did not present the theory that Fenske exceeded the scope of permission granted to him by Creamer at trial as a "coherent theory of guilt." *Id.* Rather, the State's case focused on the theory that it was Besco, not Creamer, who had the authority to grant Fenske permission to enter the home and because Besco did not grant this permission, Fenske entered the home without right, license or privilege.[1] No

1. The court of appeals recognized the State's reliance on this theory in its decision on Fenske's direct appeal. It concluded that Fenske's conviction could not be affirmed under that theory because it was Creamer, not Besco, who had the

legal authority to grant Fenske permission to enter the home. Whether this conclusion was legally correct is not necessary to decide on this appeal.

matter how the record is viewed, I cannot find that our court relied on the same theory in affirming Fenske's conviction in the first appeal as that presented at trial. The extent or scope of permission which Creamer granted Fenske was never thoroughly explored by the State in the evidentiary stage of trial, the State did not advance this argument in its opening or closing statements, and neither the trial information nor the jury instructions specifically set forth the exceeded permission theory. The exceeded permission theory relied upon by our court on direct appeal was clearly not the State's focus and not the theory on which the case was tried and submitted to the jury. *See Dunn,* 442 U.S. at 106, 99 S.Ct. at 2194, 60 L.Ed.2d at 750.

I conclude that Fenske's due process rights were violated by our previous holding on his direct appeal. As mentioned above, "[a] defendant has the right to representation that is within the normal range of competency." *State v. Hopkins,* 576 N.W.2d 374, 379 (Iowa 1998). "Such competency includes being familiar with the current state of the law." *Id.* at 379–80. Fenske's appellate counsel testified at deposition that he was not aware of the line of United States Supreme Court cases holding that a defendant's due process rights are violated when an appellate court affirms a conviction based on a theory not presented at trial. As a result, counsel failed to preserve error for Fenske regarding this alleged error by raising it in the petition for rehearing. This failure places Fenske's appellate counsel's conduct outside the range of professional competency. Therefore, I find that Fenske has established the first prong of his ineffective-assistance-of-counsel claim, that his appellate counsel failed to perform an essential duty.

## C. Prejudice

To establish the second prong of an ineffective-assistance-of-counsel claim, Fenske must show actual prejudice. To do so, Fenske must demonstrate a reasonable probability that but for his appellate counsel's unprofessional error, the result on his appeal would have been different. *State v. Bumpus,* 459 N.W.2d 619, 627 (Iowa 1990). A reasonable probability is one sufficient to under-

mine confidence in the outcome. *Id.* The State argues that even if Fenske's appellate counsel had raised the constitutional issue before our court in the petition for rehearing, we would have affirmed the conviction and thus the result on appeal would not have changed. I am unable to agree with the State's assertion.

Fenske has established a reasonable probability that the outcome of his appeal would have been different had his counsel raised the constitutional issue in the petition for rehearing. It is clear, as shown by the analysis in the previous section, that our court violated Fenske's due process rights in affirming his conviction on a theory not presented at trial. Had our court been apprised of this error, it would not likely have endorsed the error by denying the petition for rehearing. Thus, in determining whether Fenske has established prejudice, the record must be examined, as we would have done if the petition for rehearing had been granted, to evaluate whether sufficient evidence existed to uphold the jury's verdict on the theory presented at trial.

In reviewing a claim of insufficient evidence, we examine the record in the light most favorable to the State to determine if, when considered as a whole, a reasonable person could find guilt beyond a reasonable doubt. *State v. Peck,* 539 N.W.2d 170, 172 (Iowa 1995); *State v. Mulder,* 313 N.W.2d 885, 888 (Iowa 1981). A jury's verdict is binding unless there is no substantial evidence to sustain it. *Peck,* 539 N.W.2d at 172.

### D. Analysis of Prejudice Claim

#### 1. Besco's Authority

The State charged Fenske with burglary under the first alternative of our burglary statute, entering an occupied structure not open to the public without right, license or privilege to do so. *See* Iowa Code § 713.1; *see also State v. Dible,* 538 N.W.2d 267, 270 (Iowa 1995) (recognizing different charging alternatives available under burglary statute); *accord State v. Taft,* 506 N.W.2d 757, 761 (Iowa 1993). The State specified this alternative in the trial information and the jury instructions required the jury to find

"[t]he defendant did not have permission or authority to *enter* the residence." (Emphasis added.) Two other charging alternatives are available under section 713.1—remaining in an occupied structure after it is closed to the public or after the person's right, license or privilege to do so has expired and breaking into an occupied structure. All of the alternatives also require a showing of intent to commit a felony, assault or theft inside the structure. *See* Iowa Code § 713.1.

The record clearly indicates that at trial the State proceeded under the theory that it was Besco as the temporary occupant of the house, not Creamer as the usual resident of the house, who had authority to grant Fenske the right, license or privilege to enter the home. The court of appeals concluded the jury verdict could not be sustained because "[i]t was within Creamer's, not Besco's, authority to issue ... permission" to enter the home. Although the court of appeals does not cite legal authority for this conclusion, the issue is one that must be reconciled based on the facts of the case, not by reference to legal principles. *See* 3 Charles E. Torcia, *Wharton's Criminal Law* § 319, at 238–39 (15th ed. 1995) ("Permission to enter is legally significant only if given by the owner or occupant, or by a person with authority to do so."); *see also State v. Johnson,* 266 Kan. 322, 970 P.2d 990, 995 (Kan.1998) (concluding occupant of house had authority to permit entry into home based on facts and circumstances of case). Creamer testified she left Besco "in charge" of the house; however, she also testified she gave Fenske permission to enter the house, and approved of his entry on the evening in question. Creamer testified as follows:

DEFENSE COUNSEL: On the night of this incident or any other night when you were gone, did Stan Fenske have permission as far as you were concerned to enter the residence? A. Yes. It went along with the tasks that I asked—the favor that I asked—him to do.

Creamer further testified:

DEFENSE COUNSEL: How often while you were still in town would Stan [Fenske] and/or his wife come over to the house? A. Probably three or four times a week.

Q. And how would they enter the house? A. Maybe knock, open the door, kind of walk· in, hello, what are you doing, is anybody there?

Creamer further testified that she asked another friend to take care of the yard while she was away. From this testimony, it appears that Creamer did not relinquish all authority to control access to the home to Besco by leaving Besco "in charge." The State's theory that Besco had sole authority to determine who could enter the house was clearly not established by sufficient evidence.

Moreover, the State charged Fenske under only the first charging alternative of our burglary statute—entering an occupied structure without right, license or privilege. Creamer's testimony established Fenske's entry into the home on the night in question was proper. Although Besco subsequently asked him to leave, which she may have had the right to do as a guest left "in charge" of the home, Fenske's failure to leave at that time does not violate the "entering" alternative of our burglary statute. At most, Fenske's failure to leave in response to Besco's request violates the second charging alternative of the burglary statute—remaining in an occupied structure after the person's right, license or privilege to be there has expired. Fenske was not charged under this alternative and therefore cannot be properly convicted of this arguably unlawful conduct.

Furthermore, Fenske's commission of two assaults while he was inside the home does not vitiate the initial consent to enter granted by Creamer. Felonious intent and entry without consent are two separate elements which must be proven by the State under our burglary statute. *See* Iowa Code § 713.1; *State v. King,* 344 N.W.2d 562, 563 (Iowa App.1983) (finding State failed to establish element of entry without consent despite fight which occurred after defendant's presence in the home for a period of time; elements of entry without consent and felonious intent considered separately); *accord State v. Harper,* 246 Kan. 14, 785 P.2d 1341, 1348–49 (1990) (under burglary statute, entry without authority and entry to commit felony or theft

are two separate elements, both of which must be proven to establish burglary; burglary does not arise out of every entry when a crime is later committed).

I conclude, as did the court of appeals, that no rational jury could find Fenske guilty of burglary under the alternative charged—entering an occupied structure without right, license or privilege. Therefore, Fenske has established the requisite prejudice to satisfy the second prong of his ineffective-assistance-of-counsel claim.

### 2. Creamer's Authority

The State's backup argument for conviction asserts that the jury could have convicted Fenske because it thought Creamer never gave Fenske permission to enter the house. This idea is based on rebuttal testimony by Michael Bown, who was assaulted by Fenske at the house, that Creamer called him after the incident and said she had not given Fenske permission to be in the house. Creamer denied making such a statement.

The use of an inconsistent statement does not violate the hearsay rule because it is "not offered as a testimonial assertion to be relied upon." *State v. Hill*, 243 N.W.2d 567, 570 (Iowa 1976) (quoting 3A Wigmore *Evidence* § 1018, at 996 (1970)). The general rules regarding impeachment by use of prior inconsistent statements were explained in *State v. Frommelt*, 159 N.W.2d 532, 535–36 (Iowa 1968), as follows:

> It is generally held a witness may be impeached by showing his testimony upon a material matter is inconsistent with a prior statement made by him. (authorities). The impeaching testimony is not admissible to prove its truth, but solely to demonstrate the witness is not reliable because what he says now is contrary to what he said at some previous time.

We have also held that impeachment evidence is not as potentially damaging as substantive evidence. *State v. Allen*, 348 N.W.2d 243, 246 (Iowa 1984); *see also State v. Schatz*, 414 N.W.2d 840, 842 (Iowa App. 1987). Moreover, there is no other evidence in this record on which a jury could base a finding that Fenske did not have authority or exceeded authority from Creamer to enter

her house. Bown's testimony, therefore, standing alone as impeachment testimony, does not constitute sufficient substantive evidence from which a rational jury might find Fenske had no right, license, or privilege to be in Creamer's house.

### VI. Majority Opinion Analysis

The majority on this appeal seeks to cement the validity of the opinion rendered on Fenske's direct appeal by distinguishing the rules of law pronounced by the United States Supreme Court in *Dunn* and its progeny. In so doing, it misapprehends the legal point announced in *Dunn* on theory of guilt.

The Supreme Court, in its review of the Tenth Circuit decision, noted as follows in *Dunn:*

> [I]t is unnecessary to inquire, as did the Court of Appeals, whether petitioner was prejudiced by a variance between what was alleged in the indictment and what was proved at trial. *For we discern no such variance.* The indictment charged inconsistency between petitioner's statements in the September 30 interview and his grand jury testimony. That was also the theory on which the case was tried and submitted to the jury.... But *while there was no variance between the indictment and proof at trial, there was a discrepancy between the basis on which the jury rendered its verdict and that on which the Court of Appeals sustained petitioner's conviction.* Whereas the jury was instructed to rest its decision on Dunn's September statement, the Tenth Circuit predicated its affirmance on petitioner's October testimony. The Government concedes that this ruling was erroneous.

*Dunn*, 442 U.S. at 105–06, 99 S.Ct. at 2194, 60 L.Ed.2d at 749–50 (emphasis added).

Like *Dunn*, the case at bar does not present an issue of a variance. There is no discrepancy between the indictment and proof at trial as noted by the majority. However, like *Dunn*, there is a "discrepancy between the basis on which the jury rendered its verdict and that on which [we] sustained [Fenske's] conviction." *Id.* This discrepancy is highlighted by the prosecu-

tion's reliance on the theory that it was Besco who had authority to refuse Fenske permission to enter, not Creamer, while our court relied on the scope of permission granted by Creamer to sustain Fenske's conviction.

The majority affirms Fenske's conviction by assuming, without knowing what the jury decided, that the jury either decided that Besco had the sole authority to grant permission to enter the house and did not grant permission or that Creamer as the usual occupant did not grant permission. The majority believes it is enough to sustain a conviction that violation of a cited statute is charged and evidence is introduced showing a factual scenario. No theory of guilt is necessary. In fact, the majority is at pains to point out that the prosecutor charged no theory of guilt in this case at all. It states that the county attorney's information against Fenske did not charge any theory as to who had authority to give consent. The majority approves of this procedure as being in keeping with Iowa's "short form indictment" rule. *See* Iowa R.Crim. P. 31 (app. form 10). Also approved are the court's instructions which fail to mention any theory of guilt or give any instruction on who was in a position of authority to deny consent to enter the house. Thus, the majority not only gainsays any need for the prosecutor to present a "theory of guilt" to the jury but stamps its approval on an absence of any theory by finding that this procedure fits our criminal rules. Be that as it may, this approach is at odds with the United States Supreme Court's principles in deciding constitutional rights.

> Few constitutional principles are more firmly established than a defendant's right to be heard on the specific charges of which he is accused.

*Dunn*, 442 U.S. at 106, 99 S.Ct. at 2194, 60 L.Ed.2d at 750.

> The jury instructions demonstrate that petitioner was convicted merely because of his failure to disclose material, nonpublic information to sellers from whom he bought the stock of target corporations. The jury was not instructed on the nature or elements of a duty owed by petitioner to anyone other than the sellers. Because we cannot affirm a criminal conviction on the basis of a theory not presented to the jury, we will not speculate upon whether such a duty exits, whether it has been breached, or whether such a breach constitutes a violation of § 10(b).

*Chiarella*, 445 U.S. at 236–37, 100 S.Ct. at 1119, 63 L.Ed.2d at 361–62 (citations omitted).

Citing *Dunn*, the First Circuit Court of Appeals found that a coherent "theory of guilt" is required to affirm a conviction.

> The "dual representation" appellate theory *can* be adduced from the facts. But it was not the government's focus, or as *Dunn* requires, "the theory on which the case was tried and submitted to the jury." Reference to the dual representation theory, if ever made explicit, was only incidental. The *Dunn* Court regarded tangential references ... as insufficient because, in the Court's view, the prosecution did not "build its case" on such evidence.... Thus, we believe that, in order for any appellate theory to withstand scrutiny under *Dunn*, it must be shown to be not merely before the jury due to an incidental reference, but as part of a coherent theory of guilt that, upon reviewing the principal stages of trial, can be characterized as having been presented in a focused or otherwise cognizable sense.

*Cola*, 787 F.2d at 693 (citations and footnote omitted).

The majority's reliance on a statute prescribing a "bare bones" information procedure falls far short of a legally sufficient answer to Fenske's claim that his conviction for burglary violates his constitutional rights. Fenske believes we affirmed his conviction on a different theory of guilt than presented at trial. The majority affirms now on the basis that no "theory of guilt" is required. Either way, I believe Fenske's constitutional rights as claimed have been violated. Authority granted by statute to proceed as the statute allows does not excuse a constitutional violation of Fenske's rights. *See Knowles v. Iowa*, —— U.S. ——, ——, 119 S.Ct. 484, 487, 142 L.Ed.2d 492, 497 (1998) (refusing to uphold "search incident to citation" under

Fourth Amendment scrutiny despite statutory authority to the contrary).

I would reverse the district court's denial of postconviction relief and reverse Fenske's conviction for first-degree burglary.

LAVORATO and TERNUS, JJ., join this dissent.